40 A.3d 107 (2009)
425 N.J. Super. 208
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff,
v.
MERCER COUNTY SOIL CONSERVATION DISTRICT, Frank A. Baldorossi, Phyllis M. Baldorossi, Lee F. Forrester, Lisa T. Forrester, Prakash Sharma, Yogesh Sharma, Charles W. Gear, Morgan A. Gear, Aneesh Bakshi, Simi Bakshi, Defendants.
Lee F. Forrester, Lisa T. Forrester, Frank A. Baldorossi, Phyllis Baldorossi, Prakash C. Sharma, Yogesh Sharma, Charles W. Gear, Morgan A. Gear, Aneesh Bakshi, Simi Bakshi, Third-Party Plaintiffs,
v.
County of Mercer, and State of New Jersey Department of Agriculture, Third-Party Defendants.
Docket No.: C-100-08
Superior Court of New Jersey, Chancery Division, Burlington County.
Decided May 19, 2009.
*108 Kenneth W. Elwell and James T. Hill, Deputy Attorneys General, for plaintiff, State of New Jersey, Department of Environmental Protection (Paula T. Dow, Attorney General, attorney).
Lewis Goldshore and Robert J. Cash, Lawrenceville, for defendant, Mercer County Soil Conservation District (Gold-shore, Cash & Kalac, PC, attorneys).
David C. Apy, Princeton, for defendants and third-party plaintiffs, F. Lee & Lisa T. Forrester, Frank A. & Phyllis Baldorossi (Saul Ewing, LLP, attorneys).
Andrew J. Walko, Deputy Attorney General, for NJ Department of Agriculture (Paula T. Dow, Attorney General, attorney).
David M. Roskos, Trenton, for defendants and third-party plaintiffs, Prakash C. Sharma, Yogesh Sharma, Charles W. Gear and Morgan A. Gear, Aneesh Bakshi and Simi Bakshi (Sterns & Weinroth, attorneys).
*109 HOGAN, P.J. Ch.
This matter essentially focuses upon the meaning of the term "owner" in the context of the New Jersey Safe Dam Act, N.J.S.A. 58:4-1 to 11 ("the Act" or "the statute"). To that extent, this is a case of first impression. The statute itself fails to include a concrete definition, and the regulatory definition fails to provide definitive guidance. Likewise, there are no published case law precedents that address the question.
Undoubtedly, with the numerous dams and impoundments in this State and the variety of ownership and control issues that may arise, the absence of an unambiguous legislative or regulatory definition of "owner" is a gap that requires attention; defining who is an owner of a dam or impoundment determines who is responsible for maintaining or repairing that dam or impoundment in order to meet the public safety needs underpinning the Act.
The New Jersey Department of Environmental Protection ("NJDEP") initiated this action by verified complaint against the Mercer County Soil Conservation District ("the District") and certain individual property owners who own the fee interests in the real property underneath two dams in Mercer County (hereinafter referred to separately as "the Hunt Lake Dam defendants" and "the Honey Lake Dam defendants" or collectively as "the Dam defendants") pursuant to the New Jersey Safe Dam Act and its departmental regulations implementing the act, N.J.A.C. 7:20.
The verified complaint alleges that the Dam defendants are the "owners" of the two dams in question; the Honey Lake Dam defendants allegedly own the Honey Lake Dam and the Hunt Lake defendants allegedly own the Hunt Lake Dam. The District is also alleged to own both dams.
The Dam defendants and the District have filed answers. A third-party complaint has been filed against the New Jersey Department of Agriculture, which takes no position in these motions.
Following an order to show cause proceeding and an attempted mediation that may have had some initial success on peripheral issues, the District filed a motion for declaratory judgment seeking the dismissal of all claims against the Dam defendants on the basis they are not "owners" as contemplated by the Act. The District clarifies that it is not asking the court to determine who is or are the owner(s), but is rather seeking a determination that the Dam defendants are not the owners.
Both the Honey Lake Dam defendants and the Hunt Lake Dam defendants have filed cross-motions joining in the District's motion and seeking the dismissal of the NJDEP's complaint for failure to state a cause of action upon which relief can be granted, pursuant to Rule 4:6-2. Additionally, the Honey Lake Dam defendants have cross-moved against the District for a declaratory judgment upon a defense and indemnification provision contained within an easement executed to the District by their predecessors-in-title.
The NJDEP has raised an objection to the District's motion for declaratory relief under the Declaratory Judgments Act, N.J.S.A. 2A:16-50 to 62. More specifically, the NJDEP argues that the proper application of the Declaratory Judgments Act requires the filing of a complaint or arguably a counterclaim in this case, pursuant to Rule 4:3-1. The District's response is a generalized reliance upon the authority of courts of equity to resolve all disputes before it, even without seeking an equitable remedy. In the alternative, the District posits that its argument may be considered in support of the motion by the Dam defendants seeking identical relief.
*110 The Dam defendants' motions have been brought as motions to dismiss pursuant to Rule 4:6-2(e). When presented with motions to dismiss, the court is generally constrained to make its determination upon the content contained within the four walls of the complaint and, to a limited extent, any exhibits the complaint relies upon.[1] However, Rule 4:6-2 clarifies that if "matters outside the pleading are presented to and not excluded by the court," a motion to dismiss based on subsection (e) "shall be treated as one for summary judgment and disposed of as provided by Rule 4:46."
The parties here have certainly presented arguments and exhibits to the court beyond the scope of the materials that were relied upon by the moving parties and that reach beyond the boundaries of the complaint. Thus, the court shall rule upon the issues raised therein, including those issues raised by the District, by summary judgment under Rule 4:46.
Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Rule 4:46-2(c). "A party may defeat a motion for summary judgment by demonstrating that the evidential materials relied upon by the moving party, considered in light of the applicable burden of proof, raise sufficient credibility issues to permit a rational fact-finder to resolve the alleged disputed issued in favor of the non-moving party." D'Amato v. D'Amato, 305 N.J.Super. 109, 114, 701 A.2d 970 (App.Div.1997) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995)).
The trial court's `function is not ... to weigh the evidence and determine the truth ... but to determine whether there is a genuine issue for trial.' Brill, supra, 142 N.J. at 540, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)). The trial judge must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 540, 666 A.2d 146. When the facts present "a single, unavoidable resolution" and the evidence "is so one-sided that one party must prevail as a matter of law," then a trial court should grant summary judgment. Ibid.
Where there is a motion for summary judgment, "[i]t is incumbent upon [the party opposing the motion] to make an affirmative demonstration . . . that the facts are not as the movant alleges." Spiotta v. William H. Wilson, Inc., 72 N.J.Super. 572, 581, 179 A.2d 49 (App.Div.1962).
The pertinent and material facts as alleged are not in dispute. The movants, with the exception of NJDEP's allegation that they are the owners of the subject dams, do not dispute the factual allegations of the complaint. Thus, the sole issue raised by these motions surrounds the meaning of "owner" under the Act. There is no dispute that, should the court determine that the Dam defendants are not "owners" of the respective dams, then *111 the NJDEP would have no cause of action against them and they should be dismissed as defendants as a matter of law. Of course, the converse is also true. The issue of the District's ownership is not before the court in these motions.[2]
* * *
The background that leads to this case is as follows. The Hunt Lake Dam and the Honey Lake Dam are located in Hopewell Township, Mercer County, New Jersey.
The NJDEP asserts in its verified complaint that during the 1950s the Stony Brook Millstone Watershed Association ("the Association") proposed the construction of certain structures for the principal purpose of sediment control of the Stony Brook and other tributaries. This undertaking was initiated under the Watershed Protection and Flood Prevention Act, 16 U.S.C.A. 1001 to 1012 ("the Watershed Act").
In the late 1950s, the Association enlisted the Freehold Conservation District, the District's predecessor, to act as a "local organization" as defined by the Watershed Act. In 1958, a written agreement was entered into between the United States Department of Agriculture and the Freehold Conservation District, the District's predecessor and a public entity. The Freehold Conservation District agreed to act as the "sponsoring local organization" for some nine dams, including the Honey Lake and Hunt Lake Dams to be constructed. That agreement is described as an operation and maintenance agreement and a supplement to the property easements that will be discussed below.
By subsequent agreements, the last of which was in 1974, the operation and maintenance agreements for the dams were transferred to the Association; those agreements reflected that the Freehold Conservation District became known as the Mercer County Soil Conservation District.
By letter to the County of Mercer on May 28, 2002, the Association stated that "[it] is terminating the renewal sponsorship agreement among the Association, the Mercer County Soil Conservation District and the Natural Resources Conservation Service of the U.S. Department of Agriculture as executed in July 1974, and returning the responsibility for the operation and maintenance of the dams to the County."
For purposes of these motions, the court is not stating a finding of fact that the District thereafter assumed independent and sole responsibility for the maintenance and operation of the two dams in question.[3]
Both Honey Lake Dam and Hunt Lake Dam, while funded and constructed by governmental entities, were constructed on private property. Honey Lake Dam was constructed on land owned by the predecessors-in-title to the Honey Lake Dam defendants. Likewise, Hunt Lake Dam was constructed on land owned in part by the predecessors-in-title to the Hunt Lake Dam defendants. These individuals, the Dam defendants, each own a parcel of the land in fee that altogether forms the footprint of the respective dams.
Each of these dams impounds significant volume of water ("the reservoirs"). The *112 parcels that underlie the reservoirs themselves are also privately owned by the numerous individuals who own the lots surrounding those reservoirs, most of whom are not parties to this action. However, the subject dams are constructed only upon the parcels owned in sum by the Dam defendants. No allegation has been made that a homeowners association has any interest in the land upon which the subject dams were constructed.
Each of the Dam defendants has obtained title to a parcel underlying one of the subject dams by acquiring title from a preceding owner, subject to certain deed(s) of easement. In the case of Honey Lake Dam, the chain of title shows that a deed of easement entered into on November 30, 1963, between the grantors Hans G. Bauer and Erica L. Bauer, husband and wife, to the grantee Mercer County Soil Conservation District, referred to as the "Local Organization." The Bauers were predecessor title holders to the land upon which the Honey Lake Dam was constructed and currently owned by the Honey Lake Dam defendants.
In relevant part, the easement provides:
The purpose of this easement is solely for or in connection with the construction, operation, maintenance and inspection of the following works of improvement to be located on the above described land; for the flowage of any waters in, over, upon or through such works of improvement; and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such works of improvement ...
(1) The Local Organizations shall be solely responsible for the construction, operation, maintenance and necessary repair of the works of improvement herein described....
(3) The Landowners reserve the right to use said land or any part thereof at any time and for any purpose, provided such used does not interfere with the full enjoyment by the Local Organization of the easement herein conveyed.
The document also provides an indemnity and defense provision that is the subject of the cross-motion that will be discussed below.
With regard to Hunt Lake Dam, there were two easements, both dated March 6, 1959, from predecessor land owners. One was granted by Elmer E. Gaus and Anna L. Gaus to the Freehold Soil Conservation District. Likewise, a second deed of easement was granted from the heirs of the Estate of David Hunt to the Freehold Soil Conservation District. The wording of these deeds is essentially identical to the Honey Lake Dam easement, except that the Hunts Lake Dam easement does not contain an indemnity and defense provision.[4]
* * *
The NJDEP now asserts that under the Act these individual Dam defendants who hold title to their respective parcels are to be considered "owners" of the improvements thereon, i.e., the dams, constructed on their land by a governmental agency(s) nearly fifty years ago.
The NJDEP argues that, while these easements have material significance as between the Dam defendants and the District in terms of their rights and obligations to one another, they do not trump the statutory obligations imposed by the Act upon owners of dams.
*113 The specific language of the Act that is in contention is as follows:
An owner or person having control of a reservoir or dam shall:
(1) Implement all measures required pursuant to this chapter [and] ...
(3) Implement any action ordered by the Commissioner of Environmental Protection to correct conditions that render the reservoir or dam to be considered, as determined by the commissioner, unsafe or improperly maintained or to bring the reservoir or dam into compliance with standards established pursuant to this chapter.
[N.J.S.A. 58:4-5(a).]
These words provide the only indication in the statute as to who is charged with those obligations therein, notwithstanding certain provisions governing private lake and homeowners' associations for properties adjoining dam-created reservoirs that are not directly relevant in this case. As previously stated, there is no such association involvement in this case.
When interpreting statutory language, particularly in circumstances where there is or is alleged to be ambiguity, the courts of this State are primarily guided by the underlying legislative intent. As the Supreme Court has clarified,
The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language. We ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole. It is not the function of this Court to "rewrite a plainly-written enactment of the Legislature or presume that the Legislature intended something other than that expressed by way of the plain language." We cannot "write in an additional qualification which the Legislature pointedly omitted in draining its own enactment," or "engage in conjecture or surmise which will circumvent the plain meaning of the act." "Our duty is to construe and apply the statute as enacted."
A court should not "resort to extrinsic interpretive aids" when "the statutory language is clear and unambiguous, and susceptible to only one interpretation...." On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, "including legislative history, committee reports, and contemporaneous construction." We may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language.
[DiProspero v. Penn, 183 N.J. 477, 492-93, 874 A.2d 1039 (2005).]
183 N.J. 477, 492-93 [874 A.2d 1039] (2005) (internal citations omitted).
There is no dispute that the Act is a remedial statute created by the Legislature to protect the public from the loss of life and property in the event a dam fails, regardless of whether it is privately or publicly owned. The court can take judicial notice of the catastrophic failures of a series of dams caused by heavy storms within the Burlington vicinage only a few years ago as an example that underscores the need for legislation such as the Dam Safety Act. Thus, the need to interpret such legislation broadly and to "give substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing" is particularly important. Saint Peter's Univ. Hosp v. Lacy, 185 N.J. 19, 25-26 (1987).
Plaintiff cites in its brief to a Commissioner's Final Decision enforcing the Act *114 and the issue of ownership of a dam taking the position that "[t]he issue which arises in this case is one of statutory interpretation. The mandates of the Act do not rely upon common law duties which arise from the ownership of property." DEPE v. County of Cumberland, 1994 WL 184070 (March 4, 1994). While the Cumberland matter turned more upon the issue of defining control of a dam, the interpretive point remains applicable in this case.
In according due deference to the agency's interpretations of the statute, the court is not obligated to accept its ultimate conclusion where to do so would negate logic and common sense. Whereas plaintiff has stated in its brief, "that in its ordinary meaning `owner' includes a person who holds title to property," and wherever possible the courts are to afford words their common recognized meanings, careful analysis of statutory construction is still required before determining its application to the undisputed material facts in this case.
As there is no case law or legislative history that provides assistance in the interpretation of the Act, it is appropriate to look at other remedial and public safety-related statutes in this State. For example, the Uniform Fire Safety Act, N.J.S.A. 52:27D-196, provides "owner means a person who exercises control." Likewise, the Worker Health and Safety Act, N.J.S.A. 34:6A-2, the Carnival-Amusement Rides Safety Act, N.J.S.A. 5:3-32, the Urban Homesteading Act, N.J.S.A. 40A:12-33, and the Clinical Laboratory Improvement Act, N.J.S.A. 45:9-42.27, all provide the need for "control" as part of their respective definitions of "owner." Each of these statutes shows a practical and common sense approach to defining "owner" fairly while protecting the public safety.
Reviewing the specific wording of the Act at issue strongly suggests that the operative concept in the statute is "control." For example, N.J.S.A. 58:4-5 is in part titled "Responsibilities of owners or persons having control of reservoirs or dams." The statute itself states, "[a]n owner or person having control of a reservoir or dam." N.J.S.A. 58:4-5(a).
There are two reasonable ways to interpret this language. One interpretation is to read the word "owner" separate from the phrase "person having control," in which case being an owner of the land could make you the owner of any improvements upon the land even if you had no control thereof.[5] While an otherwise perfectly acceptable interpretation under the common law, there are plenty of exceptions to which this do not hold true, including utilities transmission wires, sewer pipes, and telephone poles; such items are more often than not located in or on private easements, but are not considered to be owned by the underlying property owner. The second possible interpretation, then, is to read the words "owner or persons having control" together as one phrase, such that either the owner who has control or another person having control would be responsible for the improvements upon real property. This construction implies that having control is a necessary element of being an "owner" under the statute.
Where the issue is contested as to who is the owner of the dam, as is the case here, the court must look to the undisputed components of the definition, which in this case provides a number of terms that *115 include or are synonymous with the word "control."
Furthermore, the NJDEP's enforcement of the Act is concurrently governed by a regulation that logically supports this interpretation, as well. That regulation defines "[o]wner and/or operator" as "any person who owns, controls, operates, maintains, manages or proposes to construct a dam." N.J.A.C. 7:20-1.2.
Thus, a logical reading of the Act would strongly suggest that the legislative intent would not be to impose responsibility for the repair and maintenance of a dam or reservoir upon an underlying property owner who had no control or legal ability to operate, repair or maintain such a structure. Undoubtedly, the Legislature included the language "or person having control" as an alternative in those cases, as rare as they might be, to provide that the net of responsibility was cast as broadly as possible to ensure the public safety.
This broad net should thus be able to include those person(s) with control over a dam structure and consequent reservoir that was constructed by a public entity for the benefit of the public upon private property. There is no factual dispute that these structures were constructed under the sponsorship of a public entity with public funding. There is also no dispute that the deeds of easements between the public entity and the predecessors-in-title to the Dam defendants provided the public entity the permission to construct and maintain the publicly funded projects. If the Dam defendants' predecessors-in-title, the easement grantors, had refused to enter into such an arrangement, the public entity would have had to resort to either an outright purchase of the underlying lands, condemnation or some other similar mechanism. In that case, ownership would not be disputed.
The easements themselves did not reserve any indicia of control of the improvements thereupon to the underlying property owners; reserving such rights as the right to walk upon the dam is insufficient and de minimis.[6]
The NJDEP argues that the deeds of easements are merely attempts to contract away the responsibility to maintain and repair the dams, and do not immunize the current property owners under the Act. It also argues that the property owners' remedy is to look to the entity that was the grantee under the easement. The court generally agrees with this broad proposition, particularly where there is private ownership of an existing dam structure at the time the easement was granted. Under that type of construct, the property owner cannot be entirely absolved of their statutory obligations under the Act. However, this case presents significantly different circumstances.
At the time that the easements were entered into, the dam structures had not been constructed. Even under the common law, the grantors could not own something that had not been constructed on their land. These easements were contracts that set the basic parameters that permitted the public entity to construct the dams and impoundments thereupon in exchange for good and valuable consideration *116 of one dollar and other benefits. The easements expressly states the sole purpose of the easements was for the public entity to construct, maintain, and repair the planned improvements. Clearly, this is not a case where a number of property owners constructed a dam nearly fifty years ago and subsequently attempted to evade their duties under the Act. Rather, this is a case where a public entity was seeking permission to construct a dam and impoundment for public purposes upon private property, for which it provided consideration in the form of an agreement to maintain, repair, and in all other means to control those structures.[7]
There are no factual allegations suggesting that the Dam defendants ever exerted any repair or maintenance responsibility over the subject dams at any time. In other words, they never exercised or participated in control over these structures.
The court finds that, to determine whether a person is an "owner" of a dam or impoundment pursuant to the Dam Safety Act, the following factors must be considered:
(1) The nature and extent of any legal title to the underlying real property;
(2) Whether the alleged owner constructed or participated in the structure's construction;
(3) Whether the alleged owner controls, ever controlled, or participated in the control of the structure to more than a de minimis extent; and
(4) Whether the alleged owner has legal authority to exercise control of the structure.
Those considerations having been weighed, and for the reasons set forth above, the court finds that the individual Dam defendants in this case are not owners or persons having control of the subject dams or reservoirs as contemplated by the Dam Safety Act, N.J.S.A. 58:4-1 to 11. Accordingly, the defendants' motions to dismiss the Dam defendants are granted.
* * *
The second issue to be determined is the cross-motion filed by the Honey Lake Dam defendants to enforce the defense and indemnity provision contained in the easement executed between their predecessor-in-title and the District.[8] Unlike the Hunt Lake Dam defendants' easement, the Honey Lake Dam defendants' easement contains the language that is the subject of this cross-motion. Thus, the Honey Lake Dam defendants now argue that the District is obligated to defend and indemnify them in the underlying action.
The District has also raised an issue as to a release executed on October 30, 1972, by Dieter Neus, the predecessor in title to two of the Honey Lake Dam defendants, Aneesh and Simi Bakshi.[9] That waiver is alleged to have released and saved harmless the State of New Jersey and the United States of America from all risks and liability related to that certain parcel, presumably as created by the easement in dispute. The Honey Lake Dam defendants assert that the scope of the *117 release is ambiguous and that further discovery is required to ascertain its effect.
By post-argument correspondence to the court, submitted by the District in response to correspondence from the Honey Lake Dam defendants, the District has raised the argument that this court does not have jurisdiction to decide the Honey Lake Dam defendants' cross-motion because claims to a state agency must be submitted according to administrative procedure.[10] However, the present motion seeks a declaratory determination of the parties' relative rights as memorialized in contract, i.e., the subject easement. Because the Honey Lake Dam defendants have not yet identified a claim and have not submitted such a claim to the District, the present decision is only concerned with addressing the parties' contractual obligations to each other, rather than ruling upon a specific claim.
In other words, this decision relating to the Honey Lake Dam defendants' cross-motion is limited only to interpreting the language of the deed of easement agreement as to the scope of the defense and indemnity provision of that easement. The court is making no determination at this time as to what, if any, loss has been suffered by the Honey Lake Dam defendant.[11] That determination must await the resolution of the District's separate motion to dismiss.
The operative language offered for consideration is as follows:
The Local Organization agrees to answer and defend any claim which may be asserted against it as a result of the construction, operation, maintenance and repair of the said improvement without raising as a defense or objection thereto, any claim of governmental or sovereign immunity. Moreover, the Local Organization shall and will indemnify Landowners for and against all claims, demands, suit, costs, and expenses for ah loss, injury or damage, including death, to which they, as owners of the land subject to this easement, may be put, as a result of the negligence of the Local Organization in the construction, operation, maintenance, repair and/or inspection of the above described works of improvement, or caused by or resulting from any failure on the part of the Local Organization to comply with the terms and conditions of this agreement.
The District argues that this provision only applies to tort actions, based on the language waiving its sovereign immunity defense as a public entity and the use of the terms "loss, injury or damage."
As in any agreement, the intention of the parties is to be construed from the language memorialized in the relevant document.
"Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent. A contract must be construed as a whole and *118 the intention of the parties is to be collected from the entire instrument and not from detached portions. Individual clauses and particular words must be considered in connection with the rest of the agreement, and all parts of the writing and every word of it, will, if possible, be given effect"; the words are to be given a "reasonable meaning rather than an unreasonable one and a court will endeavor to give a construction most equitable to the parties and which will not give one of them an unfair or unreasonable advantage over the other."
[Krosnowski v. Krosnowski, 22 N.J. 376, 387-88, 126 A.2d 182 (1956) (quoting 9 Williston on Contracts § 46 (rev. ed. 1945)).]
Contrary to the District's argument, the easement language excerpted above is not ambiguous. A fair reading of the entire document reflects that the intent of the parties therein was to protect the underlying landowners from liability for the dam in consideration for permitting the dam to be constructed on their property. Generally, the subject language appears to ensure that the underlying landowners would not be required to defend themselves or pay damages as a result of the District's actions or omissions in the construction, maintenance, and/or inspection of the contemplated improvements. The provision further adds language to encompass potential tort liability, and there is no indication that the obligation does not extend to suits based upon statutory liability. Additionally, such protection is provided to the Honey Lake Dam defendants against any failure on the part of the District to comply with the terms and conditions of the agreement.
Moreover, the terms of an easement agreement are to be construed in pari materia. There is no evidence in the easement that the parties intended that the District would only undertake to defend itself without indemnity, or alternatively to limit its defense and indemnification obligation exclusively to tort claims.
It is unambiguous that, in addition to negligence and personal injury claims, the District agreed to defend any claim arising from the contemplated construction and repair of the improvements. The District also agreed to indemnify the grantors "for and against ah claims, demands, suit, costs, and expenses for all loss, injury or damage, including death, to which they, as owners of the land subject to this easement, may be put" as a result of the District's acts or omissions within the terms of the easement; those terms then obligate the District to construct, operate, maintain, and repair the dam.
Accordingly, the Honey Lake Dam defendants' cross-motion is granted as to Prakash C. and Yogesh Sharma, and to Charles William and Morgan Ann Gear. The court now finds they are entitled to the benefits of the defense and indemnity provision under the deed of easement executed to the District. The Honey Lake Dam defendants' cross-motion is denied without prejudice as to Aneesh and Simi Bakshi, as genuine issues of material fact remain as to the scope of the release executed by their predecessor in title that necessitate further discovery.
NOTES
[1] The Hunt Lake Dam defendants cite Pension Benefit Guaranty Corporation v. White Consolidated Industries, Incorporated, 998 F.2d 1192, 1196-97 (3d Cir.1993) and an unpublished New Jersey Appellate Division case, Berlin Medical Associates, P.A v. CMI New Jersey Operating Corporation, A-3034-04T5, 2006 WL 2162435 (N.J.Super.App.Div., August 3, 2006).
[2] While this decision was pending, the District filed another motion to dismiss the complaint as to itself. Oral argument and decision upon that motion is pending.
[3] As previously indicated, this determination concerns only whether the individual Dam defendants are owners of the respective dam under the statute. The District's responsibility will be determined in subsequent proceedings.
[4] At some point after the easements were executed, these larger parcels were apparently subdivided into many lots and conveyed as residential lots. The subject lots were ultimately acquired by the respective Dam defendants, subject to those original easements.
[5] The NJDEP argues that simply being the title owner of the underlying real property is all that is required under the Act.
[6] The equitable argument of the Dam defendants is that they relied upon the wording of the easement(s), which do not implicitly or explicitly suggest that they are responsible for the dam structures. In fact, the subject easements state the contrary. Moreover, common sense suggests that, in adopting the Act, the Legislature never intended to create a situation where such deeds of easements lie dormant for nearly fifty years, only to spring forth unanticipated liability upon unsuspecting property owners for structures funded, constructed, and maintained by public entities.
[7] As mentioned earlier, larger parcels were eventually subdivided into the parcels currently adjoining the subject dams and impoundments, i.e., reservoirs. There are no allegations that the individual Dam defendants controlled the impoundments created by the dams. The easement language incorporates both the dam structures and the impoundments.
[8] This easement is the same as previously discussed.
[9] The release appears to have been recorded, though the date of recordation is not provided.
[10] Appeals from a final agency action must be reviewed by the Appellate Division. Were this Court to reject the matter on a jurisdictional basis, the Honey Lake Dam defendants would be forced into a Hobson's choice of either pursuing a claim that would likely be rejected as premature or else pursuing their own defense and filing a claim that would likely be rejected as untimely submitted.
[11] The District suggests that the clearly cognizable claim consist of attorney's fees under the defense language of the easement, though defendants' counsel has suggested that other potential claims may exist. Whether those specific claims must be submitted to the administrative process will have to await the court's ruling on the District's pending motion to dismiss. At that time, the court will have the benefit of the state's participation and the issue can be more fully developed.